

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**H. KENNETH LEFOLDT, JR., IN HIS**      **CIVIL ACTION**
**CAPACITY AS TRUSTEE FOR THE NATCHEZ**
**REGIONAL MEDICAL CENTER**
**LIQUIDATION TRUST**
                    **Plaintiff**

**VERSUS**                    NO. 5:15-cv-96 KS-MTP

**DONALD RENTFRO, CHARLES MOCK,**
**WILLIAM HEBURN, LEROY WHITE, JOHN**
**SERAFIN, LINDA GODLEY, LIONEL**
**STEPTER, LEE MARTIN, WILLIAM ERNST,**
**JENNIFER RUSS AND HORNE, LLP**
                    **Defendants**

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, H. Kenneth Lefoldt,

Jr., in his capacity as the duly appointed and acting trustee (the "Trustee") of the Natchez

Regional Medical Center Liquidation Trust (the "Trust") and for his Complaint against

(i) Defendants, Donald Rentfro, Charles Mock, William Heburn, LeRoy White, John Serafin,

Linda Godley, Lionel Stepter, Lee Martin, William Ernst, and Jennifer Russ, seeking

compensatory damages arising from their breaches of fiduciary duties of care, loyalty and good

faith, and for other lawful conduct detailed below and (ii) against Horne, LLP for acts of

professional malpractice in connection with its engagement as accountants to Natchez Regional

Medical Center, respectfully alleges upon information and belief as follows:

### INTRODUCTION

This action is brought by the Trustee pursuant to authority granted by the United States

Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court") to recover

the significant damages suffered by Natchez Regional Medical Center ("NRMC") as a direct

741094v.8

result of the repetitive breaches of fiduciary duty committed by defendants in their capacity as officers and directors of NRMC.

William Heburn, Donald "Donny" Rentfro, and Charles Mock, all former officers of NRMC, appear to have operated NRMC with a general disregard for their obligations and responsibilities to NRMC. Heburn, Rentfro, and Mock were so grossly negligent in carrying out their duties that NRMC and its affiliates failed to bill patients for months of services rendered, timely respond to federal audits, and properly oversee the credentialing of its doctors, among other significant issues. As a result of the gross negligence of Heburn, Rentfro, and Mock, NRMC failed to receive or otherwise lost millions of dollars, resulting in NRMC's insolvency and eventual bankruptcy. The other defendants, all former members of the Board of Trustees of NRMC, wholly abdicated their duties to oversee the actions of Heburn, Rentfro, and Mock, and to properly inform themselves of NRMC's operations and financial condition.

Horne LLP was engaged by the Board of Supervisors for the NRMC to audit its finances and ensure that appropriate control systems were in place to prevent the catastrophic fiscal failure that ultimately befell the NRMC and doomed it to bankruptcy. As a result of Horne's failure to satisfy the requisite standard of care in conducting its audits of NRMC's finances and control systems, significant flaws in NRMC's financial controls went undetected and resulted in the loss of millions of dollars in unbilled revenue, disallowed federal reimbursements and other losses.

## PARTIES, JURISDICTION AND VENUE

1.

On March 26, 2014, NRMC filed a Voluntary Petition for Relief under Chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi

(the "Bankruptcy Court").  On September 30, 2014, the Bankruptcy Court entered that certain "Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9 Plan of Adjustment for Natchez Regional Medical Center" (the "Confirmation Order").  The Confirmation Order provides, *inter alia*, for (i) the establishment of the Trust; (ii) the appointment of Mr. Lefoldt as trustee of the Trust; and, (iii) the transfer to the Trust of all claims, demands and causes of action of NRMC including, without limitation all claims, demands and causes of action against NRMC's then and former officers and directors and its professionals.  A copy of the Confirmation Order is attached hereto as Exhibit A.

2.

Defendant, Donald Rentfro is, upon information and belief, an individual of the age of majority and a resident of the State of Mississippi.  During all relevant times, Rentfro was an officer of NRMC serving, successively as Chief Analytics Officer and Chief Executive Officer.

3.

Defendant, Charles Mock is, upon information and belief, an individual of the age of majority and a resident of the State of Mississippi.  During all relevant times, Mock was the Chief Financial Officer of NRMC.

4.

Defendant, William Heburn, upon information and belief, is an individual of the age of majority and a resident of the State of Florida.  Heburn served as Chief Executive Office of NRMC until October, 2013 (Rentfro, Mock, and Heburn are collectively known as the "Officer Defendants").

5.

Defendant, LeRoy White is an individual of the age of majority and a resident of the State of Mississippi. At all relevant times, White was the Chairman of the Board of Trustees of NRMC.

6.

Defendant, John Serafin is an individual of the age of majority and a resident of the State of Mississippi. At all relevant times, Serafin was a member of the Board of Trustees.

7.

Defendant, Dr. Linda Godley is an individual of the age of majority and a resident of the State of Mississippi. At all relevant times, Godley was a member of the Board of Trustees.

8.

Defendant, Lionel Stepter is an individual of the age of majority and a resident of the State of Mississippi. Stepter joined the Board of Trustees on February 13, 2013 and remained on the Board through and after NRMC's Chapter 9 filing.

9.

Defendant, Lee Martin is an individual of the age of majority and a resident of the State of Mississippi. Martin joined the Board of Trustees on February 13, 2013 and remained on the Board through and after NRMC's Chapter 9 filing.

10.

Defendant, William Ernst is an individual of the age of majority and a resident of the State of Mississippi. At all relevant times, Ernst was a member of the Board of Trustees.

11.

Defendant, Dr. Jennifer Russ is an individual of the age of majority and a resident of the State of Mississippi. At all relevant times, Russ was a member of the Board of Trustees (White,

741094v.8

Serafin, Godley, Stepter, Martin, Ernst, and Russ, are collectively known as the "Board Defendants").

12.

Each of the defendants is subject to the jurisdiction of this Court, as each is either a resident of this State, has engaged in business in this State or has committed a tort in this State.

13.

Defendant, Horne LLP ("Horne") is a Mississippi limited liability partnership authorized to do and doing business in the State of Mississippi with its principal place of business and registered office located in Mississippi. Horne was at all relevant times prior to the NRMC's Chapter 9 filing NRMC's independent auditor. Following the Chapter 9 filing, and pursuant to an order of the Bankruptcy Court, Horne continued to provide accounting services and advice to NRMC and its Board of Trustees.

14.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334(b) as the action arises out of and is related to a proceeding under the United States Bankruptcy Code.

15.

Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391 and 28 U.S.C. §1409 because (i) NRMC's Chapter 9 case was filed and is pending in this Judicial District, (ii) the events and acts giving rise to this action occurred in this Judicial District, and (iii) several of the Defendants are residents of this Judicial District.

## FACTUAL ALLEGATIONS

16.

NRMC, a political subdivision of the State of Mississippi, was a community hospital under the jurisdiction of the Board of Supervisors of Adams County, Mississippi. Pursuant to Section 41-13-10 *et seq.* of the Mississippi Code of 1972, as amended, members of the Board of Trustees are appointed by the Board of Supervisors for the purpose of operating and governing NRMC.

17.

NRMC opened in 1960 and, at the time of the Chapter 9 filing, was licensed as a 179-bed general and acute care hospital. NRMC is subject to a myriad of complex federal, state and local regulations at every level of its operations.

18.

On June 24, 2009, NRMC created the Natchez Medical Foundation, Inc. ("NMF") to enter into employment contracts with individual physicians and to provide medical care to the community of Natchez, Mississippi. All invoices for services rendered by NMF and NMF physicians were to be billed and collected by a now-defunct third party medical billing company, believed to be Magnolia Medical. The NMF was wholly dependent upon the NRMC for financial support, administration and management. All expenses of NMF were paid by NRMC and all payments for services rendered by NMF were paid to NRMC. For all intensive purposes, the two entities acted as one from a financial standpoint.

19.

The Officer Defendants were appointed to their respective positions by the Director Defendants and the Director Defendants were responsible for supervising the performance of the Officer Defendants. The Director Defendants knew or should have known that the Officer

Defendants were not qualified by training or experience to perform competently their respective duties and, following appointment, the Officer Defendants did not devote the necessary time and attention to their duties to perform their duties competently.

20.

Upon Information and belief, Mock did not have the appropriate education, credentials, or experience to serve as Chief Financial Officer for a public community hospital subject to numerous complex federal and state regulations. Mock had no formal training which qualified him to be a Chief Financial Officer, and did not have appropriate experience or training in the regulatory web which touched all portions of NMRC's operations, billings and collections.

21.

Upon information and belief, Heburn failed to attend to the duties and responsibilities as Chief Executive Officer of NRMC. Heburn was often absent from the NRMC facility during most of the work week. Such absences were primarily for personal reasons and only very rarely for performing official functions or otherwise justified as part of his position as Chief Executive Officer of NRMC. As a result of these significant and extended absences, the other officers and employees of NRMC, including Mock, did not receive the oversight or appropriate guidance necessary for them to fulfill their duties. Heburn ultimately resigned from his position as Chief Executive Officer of NRMC.

22.

Following Heburn's departure from NRMC, Rentfro was promoted to Chief Executive Officer from his position as Chief Analytics Officer. The Director Defendants promoted Rentfro with the specific goal of reducing expenses of NRMC and improving the overall financial health of the organization. Rather than assist NRMC to stabilize its expenses, Rentfro caused or permitted NRMC to expend millions of dollars on needless expenses. In particular, Rentfro

oversaw the acquisition of multi-million dollar medical equipment that NRMC did not have the necessary staffing to appropriately utilize and was not applicable to the care regularly sought by NRMC's patients.   This unnecessary spending and Rentfro's failure to reign in NRMC's spending further weakened NRMC's already precarious financial position.

23.

The Board Defendants were required to meet regularly, oversee the operations and financial condition of the hospital, and supervise the performance of NRMC's officers.   The Board Defendants were uniquely positioned to secure information regarding every aspect of the hospital, its officers, and employees.   They failed to do so.   Instead, the Board Defendants simply relied upon limited information presented to them at meetings and did not conduct any further investigation nor demand additional explanation and detail.

24.

Even when the Board Defendants recognized that they were not being provided with sufficient information regarding a number of aspects of NRMC's operations and financial condition, they took no substantive steps to remedy this failing.   Instead, they merely complained to the Board Chairman and the Board's attorney, Mr. Walter Brown regarding the lack of timely and sufficiently detailed information.   Despite recognizing the issue and raising concerns about the sufficiency of the information they were receiving, the Board Defendants took no further action to obtain the information they so desperately needed to fulfill their duties and obligations to NRMC.

25.

By statutes, the Board Defendants were vested with the ultimate authority regarding the hiring and firing of NRMC officers and the obligation to monitor their performance.   Despite this power and obligation, the Board Defendants knowingly promoted Mr. Mock to a position for

which he was neither suited nor qualified.  The Board Defendants further failed to take any action to relieve Mr. Mock when he consistently demonstrated that he was unable, unwilling or both to perform the duties of Chief Financial Officer of NRMC.  The Board Defendants also failed to timely relieve either Mr. Rentfro or Mr. Heburn when it became clear that they were not fulfilling the obligations and responsibilities of their positions.  In fact, the Board Defendants did the exact opposite, promoting Mr. Rentfro to Chief Executive Officer once Mr. Heburn left the position.

## EMPLOPYMENT OF HORNE

26.

Horne LLP was engaged by the Board of Supervisors for the NRMC to audit its finances and ensure that appropriate control systems were in place to prevent the catastrophic fiscal failure that ultimately befell the NRMC and doomed it to bankruptcy.  As a result of Horne's gross negligence in conducting its audits of NRMC's finances and control systems, significant flaws in NRMC's financial controls went undetected and resulted in the loss of millions of dollars in unbilled revenue, disallowed federal reimbursements and other losses.

27.

Horne holds itself out as Mississippi's premier accounting firm and represents itself as having extensive healthcare experience, with approximately 30 partners and employees in its Healthcare Leadership practice group.  Horne further represents that it provides its clients with "foresight, straight talk, and collaboration needed to navigate the challenges of growth, regulatory compliance and risk mitigation in the medical field generally, and with respect to Mississippi Community Hospitals in particular."

28.

Horne has been engaged by NRMC to audit its financial statements since at least the 2008 fiscal year.  The fundamental purpose of an audit by an independent firm such as Horne is to express an opinion on whether financial statements present fairly, in all material respects, a company's financial position.  A fundamental part of an audit requires the accounting firm to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  Another component of an audit is to consider the company's internal controls over financial reporting and to test compliance with laws, regulations, contracts and grant agreements, among other items.

29.

During the course of an audit of a community hospital, a reasonably prudent auditor would have interviewed employees and reviewed certain documents and statistics regarding patient intake, credentialing of physicians and other service providers (a requirement for the payment of bills for those person's services), services provided and other aspects of the hospital's operations.  The reasonably prudent auditor also would have engaged in extensive testing of the hospital's billings, collections and bad debt accounts and systems.

30.

Horne either failed to carry out its audit as a reasonably prudent auditor would have done or it was negligent in its performance of the audit.  As a result, Horne failed to identify NRMC's lack of a system to address the RAC audit denials and that the RAC audit denials were significantly impairing NRMC's revenues.  Horne's negligence also resulted in it being entirely unaware of the millions of dollars of unbilled services, which should have been obvious to a prudent and competent auditor.

741094v.8

31.

Horne continued to provide accounting services after the filing of the Chapter 9 case.  It routinely over reported accounts receivable and under reported accounts payable.  As a result, both the duration and administrative expenses of the Chapter 9 case increased significantly.  Also, serious question as to the accuracy of the post Chapter 9 financial records impaired the marketing and confirmation of the plan of liquidation of NRMC.

## THE RAC AUDITS

32.

A significant number of NRMC patients obtain health coverage through a variety of federal programs, including Medicare.  Services billed through these federal programs are paid when billed by Medicare to NRMC on an interim basis.  The existing laws allow the government to review the interim bills and then offset against future interim payments that are disallowed under the applicable federal programs.  The reimbursement rate and payments are subject to very stringent billing standards that must be strictly adhered to in order for payment to be made.  If submissions made to the federal government do not comply with these standards, the non-conforming charges and amounts previously paid to NRMC for the disallowed charges are deducted from future interim payments or billings made by NRMC.  If a disallowance is not timely contested, NRMC cannot later contest the disallowance.

33.

The Medicare Prescription Drug Improvement and Modernization Act of 2003 (MMA) established the Recovery Audit Contractor (RAC) three-year demonstration program to conduct post-payment reviews to detect and correct improper payments in the fee-for-service Medicare program. Each RAC had discretion over the types of reviews and record requests it would

conduct within the states for which it was responsible as long as it followed the Centers for Medicare and Medicaid Services (CMS)-defined Statement of Work.

34.

The Tax Relief and Health Care Act of 2006 made the RAC program permanent and mandated its nationwide expansion by 2010. CMS awarded contracts to four RACs to implement the permanent RAC program on a nationwide basis. All hospitals in the state of Mississippi are subject to reviews under the RAC program, with the first reviews beginning in 2009.

35.

As part of this new audit system, known as RAC audits, third party contractors would review claims submitted to Medicare and determine whether they complied with the federal government's stringent billing standards. The third party contractors receive a fee based on the number and amount of improper payments, and had a financial initiative to challenge any claims which were not fully compliant with the billing standards. Improper payments may either be overpayments or underpayments. In the event that overpayments were identified, those amounts would be deducted from future payments to NRMC (and ultimately did) and could result in crippling reduction in cash flow. If underpayments were identified, those amounts would be added to future payments to NRMC.

36.

Due to the federal government's strict billing standards and an incentive to identify payments as improper for the smallest error, an increasing number of NRMC's billings were deemed improper as a result of relatively minor errors. In the event a payment made on a billing or invoice was deemed improper, a notice was mailed to NRMC informing it of the decision and providing it with specific details on how to appeal the decision. Under the terms of the RAC audit system, an appeal of any decision must be submitted within a very limited timeframe or the

right to appeal is waived and the determination that a payment made to NRMC was improper becomes final and definitive.

37.

Despite the RAC audit program being in place since 2009, NRMC never implemented a procedure for processing and responding to notices from the RAC audits even as late as 2013. As a result, NRMC's ever increasing number of RAC audit notices were simply being ignored, and the appeal periods for thousands of RAC audit determinations expired without NRMC, the Officer Defendants or the Board Defendants taking any action.  It was not until September 2013, that NRMC finally engaged the Mitchell Day law firm to address the NRMC's RAC audit issues. However, this move did not come before NRMC had lost more than $2,400,000.00 in billings as a result of ignored and unappealed RAC audit determinations.

38.

Given Medicare and Medicaid billings represented the largest source of revenue for NRMC, it was incumbent upon the Officer Defendants to implement and monitor a system for the timely appeal of RAC audits.  Likewise, it was incumbent upon the Board Defendants to ensure such a system was in place, functioning and effective.  Both the Officer Defendants and Board Defendants wholly failed to perform these obvious and critical duties.

39.

The presence of a system to monitor RAC audits was especially important to NRMC, as NRMC was paid no less frequently than monthly by Medicare at prospectively determined rates throughout the year based on diagnostic classifications assigned to each patient.  These interim payments serve the purpose to stabilize NRMC's cash flow throughout the year, with a true up performed at each fiscal year end. As there is no activity required to be taken by NRMC to remit overpayments, the process of monitoring RAC audits is the primary method in which

741094v.8

management of NRMC would be aware of NRMC's liabilities.  Horne should have been acutely aware of this fact as a result of its healthcare expertise.

40.

Medicare's disproportionate share of NRMC's revenues would have also required Horne to pay particularly close attention to the RAC audits and the NRMC's systems in place to address any RAC audit issues.  Had Horne properly conducted its audit, it would have discovered that NRMC had no system in place for handling notices from a RAC audit and informed management as early as the first year of the RAC audits, saving NRMC millions of dollars.

## UNCOMPENSATED SERVICES PERFORMED

41.

NMF employs the doctors which service the NRMC's patients.  NMF organized its doctors into individual practice groups, many of which were further segregated by medical specialty.  Billing for services rendered by NMF doctors and other employees was outsourced to a medical billing company, believed to be the now-defunct Magnolia Medical.  Upon information and belief, the billing software utilized by Magnolia Medical was substandard compared to the software utilized by other hospitals and NRMC itself.

42.

Upon information and belief, it was discovered in 2014 that for a period of several years a significant amount of the information relating to patients seen and procedures performed which was entered into Magnolia Medical's billing software was not being billed or that claims billed were being rejected.  As a result, numerous services were either never invoiced to patients and/or their insurers or other payors or never approved for payment.

741094v.8

43.

Although the exact cause of the billing and collections problem is unknown at this time, it appears that the NRMC's and NMF's failure to appropriately credential their physicians and other service providers played a significant role. Bills for services provided by physicians and other service providers who are not properly credentialed may not be submitted for Medicare/Medicaid or private insurer payment, and if submitted will be rejected.

44.

Each year physicians and other medical providers are required to renew their credentials with Medicare, Medicaid and most, if not all, private insurers. Competently managed hospitals have in place systems to ensure all physicians and other provider entities are timely and fully credentialed.

45.

Inexplicably, the Officer Defendants failed to implement any system to ensure physicians and other required providers were timely and properly credentialed, and, in fact, a number of physicians and other providers were never properly credentialed. Without proper credentialing, services provided by these physicians and other providers would be rejected outright. It is believed that Magnolia Medical may have simply ceased submitting bills for a number the uncredentialed doctors and service providers.

46.

Regardless of its root cause, the billing and collection issues with the NFM had obvious and serious consequences. First, NRMC's records of revenues were grossly inaccurate as NRMC booked revenues for which no bills had been issued or for which collections would never be made. Second, NRMC did not receive payments critical to its financial health and solvency.

741094v.8

Third, management of the Board could not possibly monitor which practice areas were profitable.

47.

The Officer Defendants should have been aware that bills were not issued nor payments received but for some reason failed to take any action whatsoever.

48.

The Board Defendants were required to take such action as necessary to confirm that NRMC generally, and the Officer Defendants in particular, had instituted appropriate systems and controls to ensure that bills were issued timely and were then pushed to collection. In fact, the Board Defendants did nothing.

49.

Furthermore, Horne was well aware of the interrelationship between NRMC and NMF. Indeed, Horne presented NRMC's financial statements on a consolidated basis with NMF. As a result of this consolidation, Horne's engagement to audit NRMC's financial statements would have required it to also perform additional procedures pertaining to NMF's financial condition.

50.

Had Horne followed the applicable auditing standards and guidelines and appropriately conducted its audit, it would have been able to successfully identify that large portions of the NMF/NRMC billing were not being paid for the services they were rendering. Employing appropriate procedures, standards and guidelines, Horne would also have been aware of the very service providers with respect to credentialing of physicians and other service providers. Horne would have also been able to further identify whether these services were simply not being billed at all or whether bills for these services were being rejected due to improper credentialing or other errors.

741094v.8

51.

NRMC's failure or inability to properly bill and collect on the services provided to NMF's patients resulted in losses of revenue in the millions of dollars.

## COUNT I

## BREACH OF FIDUCIARY DUTIES

### (AGAINST THE OFFICER DEFENDANTS)

52.

Trustee repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53.

As officers of NRMC, the Officer Defendants owed fiduciary duties of care, good faith, and loyalty to NRMC.

54.

Those duties were plainly breached when the Officer Defendants failed to create any process for receiving and responding to denials from the RAC audits. Instead, the Officer Defendants were either grossly negligent in executing their duties or completely abdicated their responsibility to create such a process.

55.

As a direct result of the Officer Defendants' failure to create any process for receiving and responding to denials from the RAC audits, NRMC lost more than $2,400,000.00 in billings from ignored and unappealed RAC audit denials. Had the Officer Defendants instituted an appropriate system, NRMC would have been able to appeal these RAC audits and received a significant portion of these disallowed billings.

56.

The Officer Defendants also breached their fiduciary duties when they failed to or were unable to bill patients and/or their insurers for services rendered and failed to ensure physician and other service providers were properly credentialed. Given these failures amounted to millions of dollars of lost revenues, the Officer Defendants were either grossly negligent in their oversight of NRMC's billing procedures and policies, or abdicated their duties and responsibilities to oversee NRMC's billing procedures and policies.

57.

The Officer Defendants are liable for all damages arising out of their gross negligence and/or these breaches of fiduciary duty and in an amount to be proven at trial of this matter.

## COUNT II

## BREACH OF FIDUCIARY DUTIES

## (AGAINST THE BOARD DEFENDANTS)

58.

Trustee repeats and realleges paragraphs 1 through 57 as if fully set forth herein.

59.

As members of the Board of Supervisors for the NRMC, the Board Defendants owed fiduciary duties of care, good faith and loyalty to NRMC.

60.

At all relevant times, the Board Defendants should have taken all necessary actions to provide appropriate oversight of the NRMC, its officers, and employees. The Board Defendants' fiduciary duties required that the Board Defendants inform themselves of, among other things, NMRC's financial condition and its operations. Instead, the Board Defendants abdicated their

741094v.8

responsibilities and failed to appropriately inform themselves of NRMC's activities or the performance of NRMC's officers and employees.

61.

As a direct result of the Board Defendants' failure to educate themselves regarding NRMC's activities or to assume necessary oversight of NRMC's officers and employees, NRMC lost more than $2,400,000.00 in billings as a result of ignored and unappealed RAC audit denials.    Had the Board Defendants not abdicated their duties to NRMC, the number of unappealed RAC audits would have been significantly reduced in both number and value.

62.

As a direct result of the Board Defendants' failure to educate themselves regarding NRMC's activities or to engage in the necessary oversight of NRMC's officers and employees, NRMC failed to bill patients and/or their insurers for the services rendered by a number of its practice groups.    The Board Defendants also failed to ensure that procedures were in place to ensure physician and other service providers were properly credentialed.    Had the Board Defendants not abdicated their duties to NRMC and appropriately informed themselves regarding NRMC's financial condition and operations, they would have recognized the significant discrepancy between services rendered, billings, and eventual collections.

63.

The Board Defendants are liable for all damages arising out of these breaches of fiduciary duty and in an amount to be proven at trial of this matter.

741094v.8

## COUNT III

## PROFESSIONAL MALPRACTICE

## (AGAINST HORNE)

64.

Trustee repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65.

Horne was engaged to act as NRMC's independent auditor from at least 2008 through the filing of NRMC's Chapter 9 bankruptcy.   Thereafter, and continuing during the Chapter 9 proceedings, Horne provided various accounting services to NRMC.  As part of this engagement, Horne was required to opine on NRMC's financial statements, which included, among other things testing NRMC's financial reporting, compliance and other systems.

66.

Horne's audits were to be conducted under the professional standards established by the American Institute for Certified Public Accountants' (AICPA) Auditing Standards Board, known as Generally Accepted Auditing Standards (GAAS).  Horne's audits were also guided by the standards established by the Comptroller of the Currency, known as Generally Accepted Government Auditing Standards (GAGAS) due to NRMC's status as a governmental entity.

67.

Horne was required by GAAS to, among other responsibilities, obtain "reasonable assurance that the financial statements as a whole are free from material misstatement, whether caused by fraud or error."  To do so, GAAS further states in part that the "objective of the auditor is to identify and assess the risks of material misstatement, whether due to fraud or error […] through understanding of the entity and its environment, including its internal control".

741094v.8

68.

Horne was also required to understand that "the circumstances related to some misstatements may cause the auditor to evaluate them as material even if they are below materiality." Horne should have known that even if RAC denials were relatively small in any given year from a financial perspective, the lack of a process to respond to RAC denials or to develop a method of calculating potential liability for RAC denials was likely to cause the financial statements of NRMC to be materially misstated. Horne was thus required to design and perform its audits to address this issue, which upon information and belief it did not do.

69.

Horne was required by GAGAS to report "(1) significant deficiencies in internal control, and material weaknesses in internal control; (2) instances of fraud and noncompliance with provisions of laws or regulations that have a material effect on the audit and any other instances that warrant the attention of those charged with governance; (3) noncompliance with provisions of contracts or grant agreements and abuse that has a material effect on the audit; and (4) abuse that has a material effect on the audit."

70.

GAGAS states that abuse "involves behavior that is deficient or improper when compared with behavior that a prudent person would consider reasonable and necessary business practice given the facts and circumstances." As part of a GAGAS audit, if auditors become aware of abuse "that could be qualitatively or quantitatively material to the financial statements[…]auditors should apply audit procedures specifically directed to ascertain the potential effect on the financial statements." Had Horne planned and performed its audits of NRMC properly, Horne would have become aware of the RAC and billing issues that were both quantitatively and qualitatively material to the financial statements. Horne was then required to

apply audit procedures to these areas specifically, which upon information and belief it did not do.

71.

Horne was further required to "discharge professional responsibilities with competence and to have the appropriate capabilities to perform the audit and enable an appropriate auditor's report to be issued" under the due care principle of professional ethics.

72.

Horne was either negligent in its conduct of the audit or failed to act as a reasonably prudent auditor would in conducting an audit of a community hospital. Had Horne planned and performed its audits in accordance with GAAS and GAGAS, Horne would have been alert to the significant issues facing NRMC and NMF much earlier than the bankruptcy filing. Upon information and belief, Horne never reported significant deficiencies or material weaknesses to management or the board of NRMC as relates to the billing and RAC issues that ultimately contributed to NRMC's bankruptcy. As Horne was obligated to report significant deficiencies and material weaknesses under the professional standards referenced above, Horne either failed to properly plan and perform its audits so as to become aware of the issues, or failed to report the issues as was required.

73.

As a result of Horne's actions, NRMC was unaware that its providers were performing services for which it was not billing or for which it could not collect. NRMC was also unaware that no system was in place to address a mounting number of RAC audit notices. Had Horne acted as a reasonably prudent auditor or not been negligent during its audit, NRMC would have been alerted to these significant problems and provided it with the opportunity to resolve the issues in a timely fashion, before they snowballed out of control. This would have saved the

NRMC millions of dollars in revenues and, if identified early enough, permitted the hospital to avoid bankruptcy.

74.

Given its claimed expertise with respect to Mississippi community hospitals, Horne was aware, or should have been aware, that Medicare, Medicaid and private insurers would reject billings for services rendered by physicians and other service providers who were not timely and properly credentialed. Horne should have apprised NRMC that there was no system in place to ensure timely and proper credentialing, that, in fact, physicians and service providers were not being credentialed and, as a result, NRMC would, and ultimately did, lose significant revenues.

75.

Horne continued to provide various accounting services to NRMC following the filing of the Chapter 9 proceeding. After Horne ceased providing those services, it was revealed that Horne routinely overstated revenues and accounts receivable and understated expenses and accounts payable. As a result, the Chapter 9 proceeding was of longer duration and greater expense than would have been the case if Horne had provided accurate accounting records. Further, the flawed financial reports significantly complicated, undermined and delayed efforts to sell NRMC or confirm its plan of liquidation.

76.

Horne is liable to NRMC for all damages that arise from Horne's actions in an amount to be proven at trial.

741094v.8

## PUNITIVE DAMAGES

### 77.

The Trustee alleges that the conduct of one or more of the defendants will be shown at trial to be so wanton and reckless as to support an award of punitive damages against such defendants.

## TRIAL BY JURY

### 78.

The Trustee demand a trial by jury.

WHEREFORE, H. Kenneth Lefoldt, Jr., in his capacity as trustee for the Natchez Regional Medical Center Liquidation Trust respectfully request that, after due and just proceedings, he be granted judgment in his favor as prayed for hereinabove against Defendants Donald Rentfro, Charles Mock, William Heburn, Leroy White, John Serafin, Linda Godley, Lionel Stepter, Lee Martin, William Ernst, Jennifer Russ and Horne LLP and that he be awarded such damages as may be proven at trial of this case together with interest, attorney's fees, costs, and such other and further relief as may be just and equitable.

Respectfully submitted,

BY: _Alyson Mills_

Brent B. Barriere, (La. Bar No. 2818)
D. Skylar Rosenbloom, (La. Bar No. 31309)
Allyson Mills (Ms. Bar No. 102861)
Rebecca Sha, (La. Bar No. 35317)
**FISHMAN HAYGOOD, L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
Email: bbarriere@fishmanhaygood.com
          srosenbloom@fishmanhaygood.com
          amills@fishmanhaygood.com
          rsha@fishmanhaygood.com

741094v.8

Douglas S. Draper (La. Bar No. 5073)
Leslie Collins (La. Bar No. 14891)
Greta Brouphy (La. Bar No. 26216)
**HELLER DRAPER PATRICK HORN &
DABNEY, LLC**
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
Email: ddraper@hellerdraper.com
        lcollins@hellerdraper.com
        gbrouphy@hellerdraper.com

COUNSEL FOR H. KENNETH LEFOLDT, JR.,
IN HIS CAPACITY AS TRUSTEE FOR THE
NATCHEZ REGIONAL MEDICAL CENTER
LIQUIDATION TRUST